May it please the Court, I am Richard Ellis, representing Petitioner Stephen Barbee, and this is a capital habeas case in which this Court has granted a certificate of appealability on Issue 3 of Barbee's COA application, whether trial counsel rendered ineffective assistance of counsel at the guilt-innocence phase of the trial by conceding Barbee's guilt without his permission. I should note at the outset that I have learned that on Thursday the U.S. Supreme Court has granted cert in McCoy v. Louisiana on a very similar question, which is, is it unconstitutional for a defense counsel to concede an accused guilt over the accused's express objection? And I will file a supplemental 28J letter on that. May I ask — go ahead, I'm sorry. No, go ahead. I was going to say you're going to write a 28J letter, but — Well, just — it may not be necessary, but I — just to inform the Court of the McCoy — Oh, oh, yeah. But I was going to say that it just granted cert, so that might be before the Supreme Court for a while before we get a decision in just that. Okay? I feel it has — Are you prepared to — are you familiar enough with it for me to ask you a question or two on it, or not — you prefer that I not? I — I think you could, Your Honor, yes. Okay. How is it — Can you mind speaking up a little bit, too? I'm having a little trouble hearing you. How is it — I understand that the factual scenario is somewhat similar, but that's not a — that's not an ed pedeference case. That's a direct appeal. And so the law, the court — in fact, the question on cert, it has to do with different courts hold different things, and so should the Supreme Court announce a standard. And it's my understanding that in this case, you're bound to — to tell us whether it violated clearly established law. So the law couldn't possibly be clearly established the chronic way, for lack of another way to say it, if that case is being asked to be taken cert in order to say — to establish that the chronic way applies, could it? Well, Your Honor, that's correct. The ed ped — we are under the ed pedeference standard here. And that — McCoy, as I read it over last night, it's a direct appeal from — from direct appeal. So the standards will be a little bit different. However, I do feel it will vastly amplify the range and — of chronic and how chronic applies in this case. And that's why — So how could it affect this case? That's my question. If it's not clearly established at the time that this case was decided by the — by the State's highest court, then how could it — then the clearly established law at that time could not be contrary. And that's my — that's my problem. How can it affect this case? In the sense that it may clarify chronic, clarify not making new law, but simply clarifying the rule of chronic, which has been under dispute in many, many cases. Well, if the law of chronic is under dispute in many, many cases, how could it be contrary to clearly established law for the Court to find that Strickland, in fact, is the proper standard here? Well, we've argued this case under two standards, chronic and Strickland. And I think that I perhaps — I don't know if — I'm not sure how the Supreme Court is going to handle McCoy. And perhaps we're getting a little afield here. But I do feel that it could have some impact here on a clarification of the parameters of chronic. And I think that's — Okay. Well, putting that to one side, do you have any authority that would show that the Supreme Court's — that the State Supreme Court's ruling — that the ruling is contrary to clearly established law regarding when chronic versus Strickland applies? Well, yes. We have — we are — our argument would be that we can distinguish this case from Florida versus Nixon, which is obviously the case in dispute here. We are saying that because there was no meaningful assistance of counsel during the — that the problem here with the Director's case is that they have based their Strickland argument and their chronic argument on the theory that the accidental death theory that was presented to the jury was reasonable. And it's not. It didn't give — it didn't give Mr. Barbee a chance for anything less than capital murder. And that's what we've argued. And under chronic, where — where we presume prejudice, there's ineffective assistance of counsel when — and this is the chronic standard — when counsel entirely fails to subject the prosecution's case to meaningful adversarial testing. And that's what we're saying here, that there's no meaningful adversarial testing when the case is based on an accidental death theory that had no chance of eliminating the death penalty for Mr. Barbee. So — You're trying the factual part, not the law part. Yes. Well, we're saying that the factual — Because the law part has to be Strickland, doesn't it? Well — Because if it was not contrary to clearly established law or it was not clear whether chronic or Strickland applied, and the State court applied Strickland, then unless you could show me clear — show the panel clearly established law that chronic would apply to the case, then Strickland would be the right standard, unless you can show that it was clearly established at that time that the chronic standard applied. Well, if — perhaps we could go to the Strickland standard, then. I think that that might clarify things. Mr. Ellis, I'd like to hear you out on your chronic theory, if you have anything you want to say about it. Yes. We'll give you some additional time, why not? Well, the — thank you, Your Honor. The cases — basically, we're saying that we have two cases here that I think are obviously in evidence, Florida v. Nixon and Haynes v. King. And Nixon is easily — and then these are cases that — where chronic was not applied and prejudice was not presumed. Now, this case is different from Nixon because in Nixon there was overwhelming evidence of guilt. The counsel conferred with Nixon beforehand. Nixon was unresponsive. He did not agree or disagree. Nixon received some benefit from this concession in the penalty phase, and the concession in Nixon was at the opening statement, where — which preserved the rights of Nixon to challenge the State's case, whereas here, the concession was at final argument. It was sprung upon Barbee. He had no notice, no — no inkling that this would be — this — this — his attorney would say that he's guilty. So we have a distinction here between Barbee and Florida v. Nixon. We have other cases here. There's no case that — is there any cases that say that — that you must have the approval or permission of your client to — to make an argument? Yes. We have Boykin. We have — well — There's some State cases. There's some State cases, yes, there are. You know, we have — Didn't Mr. English tell Mr. Barbee he was going — he was going to admit — Excuse me. No, Mr. Ray did not tell Mr. Barbee he was going to make this argument. There has been an argument made to that effect by the director, but it's not valid. If we look at ROA-466-1, we have Mr. Ray's statement. So did I explicitly ask him if I could do that? The answer is no. Did he explicitly tell me he didn't want to do that? The answer is no. Well, the questions canceled each other out. Barbee — Barbee didn't know this was coming. It was — there was not — this was — this memo that he's talking about was not an agreement to get his permission. It was his theory of the case. Barbee, the co-counsel, Mr. Moore, did not know when Mr. Ray stood up to make this argument that he was going to make the concession of guilt. So we can be pretty clear here that the — that Mr. Barbee didn't know about it either, if Mr. Moore. And that reference would be at 4705. Mr. Moore did not know. But Mr. Barbee knew that his lawyer — I've forgotten his name. I thought it was English, but — The — Mr. Ray and Mr. Moore were the attorneys. He knew his lawyer had proposed to do this. No, he really didn't know that. He didn't? Okay. He — there was a memo presented, and this reference is 4661 of the ROA. The memo was put in front of him. He refused to sign the memo. And the memo — we're not exactly clear what was actually in the memo, but it was not an agreement to get Barbee's permission to make the argument. It was basically his theory of the case. And so, basically, Mr. Ray says he — later, at 466 — at the same page, 4661, he said he didn't make an opening statement because he didn't know whether Barbee was going to testify. So there's really no — this is an ad hoc arrangement that's going on here. We don't have any prior agreement to this. Now — Had — Barbee did not testify, so I guess his theory of defense that someone else did it and he was innocent, it was harder to bring that out without his testimony. Had he testified, there'd be a bigger presentation in theory that he did not do it, someone else did it, and then there would be a starker, I guess, conflict or contradiction between his lawyer's argument and his testimony. But in this case, we don't have Barbee testifying, so the evidence with regard to his — Mr. Barbee's theory that he didn't do it, someone else did it, it's — there's a pretty small amount of evidence to support that theory in — is there not? I agree that it is harder that he did not testify, but as Cronick teaches, even when there's no evidence here, the defense counsel is under an obligation to put the state to its burden of defense, guilty beyond a reasonable doubt, and that's in Cronick. So he could have — even without that, though, he could have done a number of things. He could have shown the motive of Ron Dodd to commit the murder, and there was substantial financial incentives here for Ron Dodd and the woman he was living with, Barbee's ex-wife Teresa, to frame Mr. Barbee. There's a lot of things here. There was a financial motive. What has been said here by Mr. Ray is basically an admittance that he didn't investigate these motives. He said there was — well, there was no motives for Ron Dodd to do it, but he didn't investigate this. The same thing — when getting back to the Strickland standard, the same thing happened with the state's theory of the case, now that it was an accidental murder. There was no investigation of this. If they wanted to, even under Strickland, not assuming Strickland applies, but even under Strickland here, there's an obligation to present this theory with some sort of evidence beyond a perfunctory cross-examination of a few witnesses. There was no expert, for instance, to show that it might have been easier for Lisa to have been strangled when she was pregnant. There's no expert on that. There's no investigation here. There's no — there's nothing here, and it clearly would not satisfy the Strickland standards. If assuming Strickland applied, though, on the factual point of whether or not there's prejudice, you have a double-deference issue, don't you? Well, we have — yes, I suppose so. We do have prejudice, though, and this is unlike — and I think we need to distinguish this case from Haynes v. Cain, where the court said basically that we could assume that failure to get consent to this theory could be possibly deficient performance under Strickland's first prong. But we have prejudice here. We have — the failure to present the Rondau-Didet defense is the main area of prejudice. We also have the elimination of any lingering doubt as to guilt. We have the half-baked and really non-presented accidental death theory would have caused a loss of credibility in the jury. I mean, this was a very short argument. It was not presented thoroughly or really at all besides some cross-examination. And I think it's important to note that the cross-examination of the coroner, Krauss, was harmful, actually. I mean, Krauss really said that it took many minutes. What evidence of accidental death are you talking about? The theory, the only — the theory that Mr. Ray argued at final argument at the guilt phase, he argued accidental death. So he said there wasn't much to support that, and the State is now saying that basically what supports that is Mr. Ray's cross-examination of Mr. Krauss, the coroner. But the cross-examination of Krauss really did not show much of anything. It just showed that the prosecution went right back in argument and hit them with that, saying that — You're not talking about the failure of defense counsel to make an accidental death case, are you? No, I'm not. No, we're saying that that was invalid ab initio, that there was never any valid accidental death theory here. And that's why it fails under Strickland. One of the reasons why it fails under Strickland, because they were pursuing a dead end. They were pursuing something that was — and we've made the legal argument here. There's two reasons. 1902b, there's other theories here. Even — it didn't account for Jayden's death. It only accounted for Lisa's death. The definitions of intentionally and knowingly would still not have excused an accidental death by strangling her too long. This was not — Did you say 1902b before the state court? No. And I think this needs explanation. This was their argument. The director and the federal district court raised 1902. 1902 is not in the jury instructions. It's not in the jury charge. It's not — Ray did not — Because they weren't relying on it. They were relying on intentional, and they weren't presenting this alternative theory to the jury. So doesn't that actually undercut your argument that it's somehow deficient for presenting it? Because if they're not relying on this position that they could have relied on at trial, then it doesn't — he's not undermined for arguing the accidental theory. Well, he is undermined by arguing intentionally or knowingly, because intentionally was defined as a person acts intentionally or with intent with respect to the nature of his conduct or as a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. It does not — it speaks to the conduct, not only to the result. This is why the intentionally and knowingly was wrong. And we're not dependent on 1902. And what we're saying regarding 1902 is that basically we are responding to their argument. So we have no obligation to raise this in state court. When they're in federal court, the district court and the director uses it as a bogus rationale. This was — we're saying that there's other theories under 1902, B1, 2, and 3. He mentioned B1. We're mentioning B2 and B3. There are other theories here in which he would still be convicted of capital murder. And that's why, under Strickland, this accidental death theory cannot stand up, because they went after something that was invalid. And this is why we're saying, getting back to the chronic standard, Judge Dennis, in your concurrence in Haynes v. Kane, said that chronic means — does not mean simply presenting no evidence. It means presenting no meaningful adversarial testing of the State's case. And that's exactly what went on here. There was no meaningful adversarial testing when they're pursuing an accidental death theory that could go nowhere. Under 1901, B2 or B3, or intentionally or knowingly, this was not a valid theory. So we have — we have a no-go here in terms of Strickland. Now — Can you go back to prejudice, though? Yes. Thank you. The court found that there's no reasonable probability that with any lawyer doing any better job that any other outcome could have happened. Well, we hotly dispute that. Basically — Well, but, I mean, it's double deference. Well, yes. But what we have here is — there was no — for instance, I mean, just the pursuance of the accidental strangling death theory alone is — you know, it's not prejudicial, but it does take away from the Ron — he should have — he had the right to have the Ron Dodd theory put on. And this is what he's been saying all along. It eliminated — it would cause a loss of credibility. This was a half-baked theory. It wasn't proved. It prejudiced Barbee by eliminating the presentation of mitigating evidence on crucial future dangerousness issue, for instance. The attorneys say, well, because Barbee asserted his innocence, we couldn't present all of this mitigating evidence, the head injury, the drug use. But this is nonsense because they didn't assert his innocence. They're having it both ways here. They're saying, well, you know, he's guilty, but then at the penalty phase, we can't put on all this mitigating evidence because he's asserted his innocence, which they never asserted. So it's a double standard here. This is prejudice, too. It hurt instead of in Haynes v. Cain where it helped the client in the penalty phase. This hurt Barbee because they were saying that because, you know, this — all this stuff is incompatible, all this mitigating evidence is incompatible with his assertion of innocence, which they never asserted to the jury. So they're trying to have it both ways. The district court held that Barbee's attorneys were constrained in presenting this mitigating future dangerousness evidence. And remember, this is a 37-year-old businessman without a criminal record. And if this is not a good candidate for lack of future dangerousness, you know, it's hard to find anyone that would be. There's another prejudicial area here that I think should be mentioned. In Haynes v. Cain, a big factor in finding no prejudice under Strickland was that the arguments were directed towards — there was some validity to the arguments in showing that the death was not intentional. But here — and also those arguments in Haynes deflected the attention away from the gruesome aspects of the crime itself. Here, the argument of accidental death focused it on the gruesome aspects of the strangling and how long it took. I mean, this was a horrible crime. And why — you know, they focused the attention here instead of in Haynes deflecting it away. So I think you have a number of areas of prejudice here under Strickland, not assuming that Strickland is to be applied. But the chronic argument — You're talking about areas of prejudice. The only area of prejudice that's before us now is the statement in the closing argument. So the failure to argue certain things in the punishment phase and to do all these things, that's not part of what we consider because we only granted a COA on this one argument. So we have to determine if he had not have said this in closing argument, is there a chance that he would not be found guilty? Yes, because it's not just the closing argument that was prejudicial. If they were pinning all their hopes on an accidental strangling death bandwagon, then they really had an obligation to go and develop that. But that's not — we didn't grant a COA on that they failed to develop evidence and do things. No, but — We didn't grant a COA on what he said at closing argument. Isn't that true? No, well, as I — I mean, I wasn't a member of the panel at the time, but that's the way I read it. The COA grant was on whether counsel rendered ineffective assistance of counsel at the guilt-innocence phase of the trial by conceding his guilt to the jury during closing argument. Conceding during closing argument, not whether they should have had an expert or presented some head injury testimony. Those have all been taken care of in the COA and in other proceedings ahead of time. Well, I think that to judge this case by Strickland standards, we have to take a holistic view of what happened here. We can't just say, well, he just argued this. We have to say the argument was unsupported and not valid, doesn't meet the Strickland first prong because he didn't support it. Yeah, but don't we need to look at — well, right, first prong. But second prong, we have to look at what is the other evidence in the record that he did it. That's what we should be looking at, what is the other evidence. Not what other evidence they didn't develop, but what is the other evidence in the record that he did it. And then you need to tell us why that's insufficient. Well, there was never any effort to develop this other evidence is what we're saying. We're saying that they didn't. I'm not talking about the development of evidence that shows that he's not guilty. I'm talking about you have to overcome that the evidence that is in the record that he is guilty would not render him guilty in light if they hadn't made this concession in closing argument. Well — Isn't that the standard? Yes. I think that we don't — well, Strickland is not an outcome-determinative test. We know that. We know that basically if you can show here that there was a fundamental failure here in the trial, that basically he would meet the second prong, the prejudice prong of Strickland. What we don't have to — I think that we have shown here that there's a lot of evidence, and this court went through them in its opinion on the ground of the COA. I think it's on page 12 and 13. There's lots of evidence here that shows — I'm sorry. I've got a red light here. We'll save you some time on rebuttal. If you want to finish that statement, you can. Well, I was just saying that there is a lot of evidence, and it is detailed in this court's opinion on the ground of the COA as to the Rondod did-it theory, and there's a lot of evidence. Okay. We'll hear you again on rebuttal. Mr. — I'm sorry. I don't have my glasses on. What is it? Mr. McCork? May it please the Court. Trial counsel confronted two inescapable facts. There was overwhelming evidence proving that Barbie suffocated his pregnant ex-girlfriend, Lisa Underwood, and her 7-year-old son, Jayden. Second, there was no evidence that Rondod committed the murders, and there was simply no way to present that theory to the jury. The state court properly applied Strickland, and Barbie fails to show that counsel's well-developed, consistent strategy challenging the state's theory of intent was deficient. And in any event, he entirely fails to show that he was prejudiced. First, there's — When chronic applies, or does chronic apply? Judge Elrod, as you pointed out, I think every court to address this issue of counsel conceding guilt to a lesser-included offense in order to challenge an element of a greater offense has applied Strickland. It is expressly determined that Strickland applies. What if McCoy comes out and says that chronic applies in a case where the lawyer concedes guilt? What if McCoy holds that? That would have no effect on this case for two important reasons. The first is, as you pointed out, Judge Elrod, the ADPES standard of review applies here. There had to be then-existing federal precedent that made the state court's determination to apply Strickland unreasonable. Secondly, the federal non-retroactivity principles under T.D. Lane would prohibit this court from — or any federal court from applying McCoy to these circumstances. In addition, just a quick review of McCoy, there was a different situation in McCoy. In McCoy, the defendant expressly told the trial court and told counsel that he did not want to concede his guilt. And we don't have that here. So you have different circumstances in McCoy as well. But he didn't know his lawyer was going to specifically stand up and say this in closing argument, did he? The record doesn't reflect that necessarily. So closing counsel is correct on that, that while there was some kind of discussion — Well, it doesn't say that he did know. It says that he had some kind of document about his theory of the case, and he didn't sign it. But it doesn't say, I know that tomorrow you're going to stand up in closing argument and say this, and I approve or disapprove or I stand silent. The record is not entirely clear on that. What is important here, and what I don't think has been really filled out yet in the previous argument, was that there were two separate State habeas applications here. And this chronic abandonment claim, or ineffective claim for conceding guilt, was raised in the first application. When the first application was filed, there was not even an allegation that counsel failed to consult with Barbie. And that was not even alleged until the second application, when Barbie attached a declaration in support of his actual innocence theory to his subsequent application. And that's when all of that evidence came out. So it's important, if this is the reason why this case is different than Nixon and why chronic should apply, that there was a failure to consult with him about this, it's important that he would have at least alleged it and provided evidence of that before the State court, when it adjudicated this claim. And that didn't happen. So... It doesn't seem like this was a very good idea to concede this in closing argument, does it? Well, I think the record reflects that this wasn't just something that counsel decided to do at closing argument. I think the record reflects that after a thorough investigation of the possibility of presenting an innocence defense, and that included consulting with a wrongful conviction expert on false confessions, a psychiatric expert, and reviewing the entirety of the record, counsel decided that the best evidence to show, to save Barbie from a death sentence, was his own confession, his own words. And Barbie thus far has concentrated on the fact that, on Dr. Shoup's testimony, but I think what counsel was really trying to capitalize on here was Barbie's own words, in which he said, I didn't mean to hold her down too long. But it doesn't get rid of the situation with the child, though. So it just creates this problem with the child. I mean, it draws attention to that, doesn't it? It doesn't seem like a great strategy, does it? I think in light of these circumstances, it comes across as a reasonable trial strategy, and certainly it comes across as meaningful adversarial testing. Again, there was overwhelming evidence here in terms of the death of the 7-year-old son. That was something the jury was going to find beyond a reasonable doubt because of the evidence. That wasn't counsel that told them what the evidence was. And what happened here was it's clear from the jury charge and from the Texas capital murder statute that there were two intentional murders that were required here. And so the strategy was... The charge was intent to do the act, not intent to kill the person. Counsel was well aware of that, and he read the definition to the jury. And I think when the charge says, or when the law says intent to do the act, that means the intent to smother the victim, not the intent to hold her down. And I think it's clear that when Barbie says, I didn't mean to do it, she kicked me, and I grabbed her, and I held her down, and I didn't mean to do it, and it was an accident, that that was an available argument that this was unintentional, that at least the police's death was unintentional. But is he saying, I didn't mean to hold her down, or I didn't mean to hold her down too long and thereby kill her? He says, I held her down too long, I didn't mean to do it. And I think the jury could see that emotional confession to his wife, which I think the district court properly characterized as something that, where he appeared remorseful and where he appeared genuine, that the jury, that counsel gave the jury the opportunity to simply believe that. And that, in light of all of this evidence, counsel reasonably determined was the best way to save Barbie from a death sentence. Now, was this, was this decision made, when was this decision made by defense counsel? Do we know at the very beginning? Was that the theory from the very beginning? Did he see that things weren't going well and change theories in the middle of the case? Or was this just something that came up when he was going to give his final argument? Your Honor, I think it's clear that this was a developed strategy. From Vore Dyer, counsel Vore Dyered extensively on the intent issue and made sure that everyone that was included on the jury was, was, was able to find the defendant not guilty of capital murder if they couldn't find the element of intent. He reminded the jurors of that at closing argument. There was extensive cross-examination of Dr. Kraus. I think Barbie's tried to downplay that to some extent by saying that there was favorable evidence for the State that was elicited by the State's witness, Dr. Kraus. However, on cross-examination, Dr. Kraus unequivocally stated that Lisa could have only been, it's possible that Lisa could have been held down for only 30 seconds. And that would have matched exactly what Barbie said. So the theory, the defense theory was consistent throughout the trial? It was absolutely consistent. There was also a motion for a direct verdict at the end of the State's case. There was, and there was consistent cross-examination of witnesses to try and develop this theory. What about the argument under the statute? The argument under the statute, first of all, is unexhausted. It was not raised before the State court. And that's very important in this, in this circumstance because it's a, it's an analysis of the statute. And if this wasn't presented to the State court, there was no way for the State court to determine that a less culpable mental State could have supported capital murder. I would also, I would also state that there is no case law that would support the fact that B-2 or B-3 could, could support the capital murder conviction. And in fact, the State, the Court of Criminal Appeals has actually stated, not directly in response to this type of claim, that there are two intentional murders required under this part of the statute. So that would have had to have been presented to the State court, first of all. Second of all, what controls here is the jury charge. And the jury charge expressly stated that in order for Barbie to be found guilty of capital murder, the State had to prove two intentional murders. So the court, the State was not relying upon that part of the statute, even if it could have? No, Your Honor. And it's very clear from the State's closing argument that they're not. It's very clear that the State is arguing that Barbie's incorrect and that there were two intentional murders here. And they essentially state that in order for the jury to find Barbie guilty of capital murder, they have to believe that he's lying when he talks to them. So the State absolutely believes and plays into this and argues that if Barbie is telling the truth, that he didn't mean to do it, that the jury can't convict him of capital murder. So I think that there's clearly an adversarial process, and I think that shows that there's clearly reasonable trial strategy here. Can you address the prong, too? Yes, Your Honor. Is that a better argument for you? Prejudice? Prong one, yes. I think it's more clear from the record. I think it's more clear that there's no prejudice here because there's overwhelming evidence of Barbie's guilt. And there's no evidence in the record or even since attached to the State habeas application, the initial State habeas application especially, that someone else, that an alternative perpetrator could have committed the crime. Can you go through what you believe that overwhelming evidence is and then also address opposing counsel's argument that, well, if there's overwhelming evidence, it's because they didn't get to put in a lot of other things that would have helped show that Mr. Dodd did it? I'll start with that first. Your Honor, I think you were correct when you stated that the issue that was granted COA was on the decision to make this argument, not a failure to investigate claim, not a failure to present evidence claim. So I don't think the Court can look at prejudice from what could have been investigated or what could have been presented. In addition, the evidence that he tries to rely on now was presented again in that subsequent State writ. It was not before the State court when it adjudicated this claim. And I think what's also telling is that when the district court adjudicated the actual innocence claim, it referred to this theory as unsound. Referred to what? Referred to the actual innocence claim. So the evidence that he's relying on is the actual innocence evidence, basically. It was attached to the subsequent State writ to support a claim of actual innocence. Did it just refer to it as unsound or did it make a determination? It made a determination on the actual innocence claim, and this Court denied COA on that as well. But it's important that there is a higher standard, but the Court explicitly stated that it's an unsound theory. So I don't think that there's any, even if this Court could consider that evidence, which it can't under the ADPES standard of review, there's no support for the fact that Barbee would have been found innocent if any of this other evidence was presented. And again, it's also not, it's also correct that COA was not granted on the issue of failure to present evidence or failure to investigate evidence. And so Barbee has now turned to an argument that he was prejudiced at punishment, that by conceding guilt, counsel removed the lingering doubt for the jury, the potential of lingering doubt. And again, this is the first time he's made this argument in the Fifth Circuit. He didn't make that argument in State court. He didn't make that argument to the District court. And the District court, I think, and the State court reasonably looked at prejudice at guilt innocence. But what's more important here is that there's no evidence that the jury would have had lingering doubt here, because... When you say it's the first time he's made the argument in the Fifth Circuit, are you saying he didn't preserve it properly in the Fifth Circuit? Or do you believe, do you concede that he did preserve it throughout the Fifth Circuit proceedings? Throughout the Fifth Circuit? He, I don't believe he made the argument in the COA. So he's made it for the first time? For the first time in his merits brief, yes. But I think what's more important here is that it's clear that he's essentially conceded that there's no prejudice at guilt innocence. And that makes sense, because there's no evidence to support a Ron Dodd-Didditt theory, there's no evidence to support a theory of pure innocence. And the Texas... So there's likewise no evidence that there would be lingering doubt at punishment when the jury is determining whether or not to oppose the death penalty. Also, it's clear that the Texas special issues on the death penalty are future dangerousness and mitigation. There is... And that is what counsel concentrated on. And the Supreme Court has actually expressly held that lingering doubt is not mitigation evidence, and it doesn't even have to be presented to the jury. So I don't think that, and he cites no law supporting that you could have prejudice from a guilt innocence argument based on lingering doubt at punishment. And to the extent the State court would have reached that, they certainly reasonably applied Federal precedent. And then I'll also turn to the... This is an important factor, as no forensic evidence tied Barbie to the crime, and there was evidence of Ron Dodd's culpability. He's trying to say that there's not a lot of evidence that Barbie did it. That's the way I read of the brief. And you haven't addressed that still, and I have to ask you twice to address that. On guilt innocence? Yes. Oh, okay. I'm sorry about that, Your Honor. There was... As I read his briefing, I think it was just confined to prejudice, but I'll talk about guilt innocence as well. Barbie was caught burying the bodies. That's undisputed. He ran from police when he was caught burying the bodies, and then he confessed to police, and then he confessed to his wife when she came into the confessional. And this is all stuff the jury had? This is all in front of the jury. At the guilt stage? At the guilt innocence stage, yes, Your Honor. And there was no explanation for that. And I think it's important, Judge Prado, I think you mentioned that Barbie wouldn't testify. So if there was going to be... I don't think there's been a theory that this evidence could have been combated or that based on a pure innocence defense. But if there were, there's no way it could have been presented, because there's absolutely no explanation on the record, and there couldn't have been any explanation on the record for why he was burying the bodies. Why did he confess? Why did he confess to his wife outside the presence of police? Was there a declaration by Barbie made by the defense, or... Where did that come from? The declaration was also attached to the subsequent state habeas. So it actually was not before the state habeas court. So the state habeas court had no indication of that. But more importantly, the declaration wouldn't help him at all, because he wouldn't testify. So... I'm sorry. I'm sorry. I didn't hear you. I'm sorry. He had refused to testify. So simply his declaration stating what his theory of the case... We can't consider that as evidence? Sorry? Nobody can consider that as evidence? No, Your Honor. Neither side? Neither side. Neither side can consider his declaration as evidence, both because... So we have two confessions and the location of the bodies. Correct. And that's the worst evidence? That's the worst evidence. He also... Well, and during one of his confessions, which again was, there's no evidence of coercion here, this was outside the presence of police, it's to his wife, it's emotional. The district court, I think, properly described it. He even described his motive in the confession, and this was played for the jury. And there's no doubt he was burying the bodies, and then he took the police to the bodies the next day. And again, there's simply no explanation that could have been presented, and there was no explanation in the record that was presented for any of that. His theory now is that Ron Dodd did it. The only person that could explain that would be Barbie himself, and Barbie, in the memorandum of understanding, it's clear that Barbie completely refused to testify. What do you think is the most similar case to this one in our precedent? We have a lot of cases. I think that's a good question, Your Honor. I think this is somewhere between Haynes and Nixon. It's similar to Haynes in that there is a strategy to concede guilt to a lesser-included offense in order to defeat the element of intent. So I think it is definitely very similar to Haynes. What's different about this than Haynes is the assertion to the trial court in Haynes that he was innocent, that Haynes was innocent, the defendant, that he didn't want counsel to be making this argument, and that he did not want that argument to be made at all. So there was expressed disapproval. And I think those are the two circumstances where it's still a Strickland analysis, but where the court has or different courts across the country and even Nixon indicated where there might be deficient performance, only under Strickland, but there might be deficient performance when there is expressed disapproval of counsel's strategy, and that's what the court held in Haynes, and we don't have that here. We don't have evidence of that here. Or where there is a failure in the duty of consultation, and we also don't have evidence of that, and that was not even alleged in the State court, that there was a failure of consultation. The specific claim raised in the State court and the evidence was that Barbee didn't give his permission to make the argument. And that's the same claim that was in Nixon. So in terms of the issue of consent. Kennedy. Do we have evidence that he objected to the argument, only that he did not consent? I mean, I know it's a slim difference, but he was aware that this argument was going to be made. I'm not sure that the memorandum of understanding reflects the fact, and that was attached to the first State habeas. It reflects that counsel explained that they were not going to be able to put Ron Dodd's statements in, that they were not going to be able to challenge his confessions, and they had Barbee sign that, and then they explained all of that to him. And that was about a month before trial. But the record in the State, the initial State habeas is somewhat silent as to whether or not there was consultation about this specific argument. And all that was alleged was that counsel conceded guilt, or partially conceded guilt, without obtaining permission. And that's the exact same claim that was raised in Nixon. You might have answered this before, but what evidence was there in the record that the theory that Dodd did it and he didn't do it? There was none. There may have been a passing reference to the fact that Dodd brought him shovels, I think from Detective Carroll. Detective Carroll talked about the confessions, talked about Barbee's confessions, and stated that he had gotten information from Dodd that, I believe he testified that he had gotten shovels, or that he knew possibly where the location of the body was. But that's information that came from Barbee, and that's information from Barbee himself. And he couldn't, and he also told Detective Carroll that he did it. So I don't think that that would be, that's persuasive evidence that would show any sort of a Ron Dodd did it argument could be successful. Now, Dodd did not testify. Was there an attempt to subpoena him and bring him? Did he plead the Fifth Amendment? Or how did that process take place? At the beginning of defense counsel's case, they called Dodd and he pled the Fifth. And counsel expressly, and that's, I think, important on this record, too, is that the memorandum of understanding that they wrote down and had Barbee sign informed Barbee that, that he was going to plead the Fifth, that they called him. So they were consulting. There's no question here that on this record they were consulting with Barbee. And I think that's probably why initial state habeas counsel didn't even allege that there was a failure of consultation here. And that ended up bearing itself out, and I know it's not before this Court, but when there was a subsequent writ, as my colleague was talking about, counsel explained that he did explain his strategy to him. And I think that's why there was no allegation before the State court on this claim and no evidence before the State court on this claim that there was expressed disapproval, like there was in Haynes, or that there was a failure of the duty to consult. And I want to make clear that even if there was, even if the Court could find that there wasn't proper consultation here, that's still a claim that's raised under Strickland. Nixon expressly cites Strickland when they talk about a duty of consultation. This Court in Haynes found that chronic does not apply when, even when there is expressed disapproval. And multiple courts across the country, multiple circuit courts have found the same. Even when there's not consultation, which is not the case here, or where there's expressed disapproval, Strickland still applies. And that's, again, this is an etha case, and that's what was before the State court. So it's certainly reasonable that the State court followed all of this Federal precedent and applied Strickland in this circumstance. I would also note that I think it's important here that there was an allegation that counsel didn't investigate. And that's simply not the case, and it's belied by the record. Counsel, at Barbie's request, had Dr. Richard Leo appointed, who was a false confessions expert. And so this belies the theory that counsel simply just wasn't listening to Barbie and that counsel went off on their own and made a different argument than Barbie wanted. They had Dr. Leo appointed, and Dr. Leo, after reviewing his confession, after having Barbie send him a letter, reviewed the records and stated that the confession was far more likely true than false. And he stated not only that it was far more likely true than false, not only that he wouldn't be a good witness for Barbie, but he said that if he were appalled, he would be a successful witness for the State. And this was a defense expert on false confessions. And then counsel then spoke with a psychiatric expert who interviewed Barbie. And the psychiatric expert, Dr. James Shoup, told counsel that this was, that Barbie, when he was protesting his innocence, was illogical and that he was having fantasies about his legal situation. So that's what counsel had before them. They investigated this thoroughly, and they made a decision to argue the accidental death theory. And that was a sound decision, because now Barbie is asking counsel, is requesting that counsel would have listened to these two experts that they had retained, who told him that this was an illogical theory, that this was a fantasy, that this was a far more likely true than false confession, and attempt to argue that, attempt to first of all challenge the confessions and provide some explanation that's not on the record, that they have no ability to explain for why he was burying the bodies. You bring up that perhaps he's having fantasies at the time of making decisions in the case with his counsel. This is not a case that has to do with his competency in any way, is it? Not at all. And the record reflects that he was competent. And I think that the way that Dr. Shoup described it was that he seemed extremely competent, but that he was more concerned with what his family thought of him, that he didn't want to hear his family tell him or hear him confess his guilt in front of his family, that he was not concerned with essentially the reality of his legal situation. There's no indication that he was incompetent. There's no claim that he was incompetent. Unless the Court has any further questions. Do you think that the case that the Supreme Court has granted cert, and it's a direct appeal, deals with similar issues? But given that that's a direct appeal, we have a habeas here, standards might be different. Is that case distinguishable from ours, or is the standard distinguishable from ours? Could that case have an effect on the ruling on this case? It could not have an effect on the ruling on this case because of the AEDPA standard of review. I mean, I think that it's, and also because of T.V. Lane, the non-retroactivity principles. I also think it's telling that the Supreme Court granted this on direct appeal, and that this is the only way it can really address this issue, because it's basically an admission that there's no clearly established federal law that would prevent the State Court from doing what it did. That there's at least an open question. I would disagree a little bit with what my colleague said about there being, this being a hotly debated issue. There's no debate over it. Every single court has applied Strickland in these circumstances. And if the Supreme Court wants to decide that differently on direct appeal in McCoy, in different circumstances, I would also note there are different circumstances, I mentioned that earlier, then, and it certainly can do that, but it would not apply to this case. You would only apply to new death penalty sentences, then, pretty much? Correct. There might be some gap between people who think something was on direct appeal at the time. Right. It would have to be claims adjudicated before or after the Supreme Court came down with that decision. But it would not apply to this case. And if the Court has no further questions, the Director respectfully requests that this Court affirm the denial of habeas relief. Thank you. Thank you, sir. Mr. Ellis? May it please the Court. I just would like to address some of the Director's counsel's arguments. First of all, he made the argument about consulting with Barbie, and this is really absolutely refuted in the record here. We have to remember that Barbie, and this is at ROA 477 and 480, wrote letters to the Court asking that his attorneys be dismissed because they weren't cooperating with him. And in one of the letters, he said there's been a complete breakdown here of communication. And so we have these written letters were written fairly early. We have not only the letters, but we have Barbie's constant insistence that he was innocent here, and they weren't investigating the innocence. That brings me to another question here that came up both in my presentation and in counsel's, the scope of the COA here, which is whether Ray rendered ineffective assistance of counsel at the argument. But to show the ineffectiveness, we have to show that the argument was not backed up by a reasonable investigation under Strickland. We were not precluded from going into what he did or did not do in terms of the theory that Lisa was accidentally strangled, because if the argument is up there without any investigation of the accidental strangling theory, then it's clearly ineffective under the standards of Strickland. So that's what we were trying to show here, that basically — How could they have investigated that? Well, they could have. The investigation that counsel was talking about was not on the theory of the case. It was on other things. So we're saying that there was no — they could have, for instance, put an expert on, and this was their theory, that Lisa died quickly, more quickly, because she was pregnant. They had no expert to show that. They could have shown — Didn't the medical examiners say that themselves? So that's better than having an independent expert on that, because you get the person who's testifying for the other side who freely admits that. Well, I'm not sure it was that clear. But certainly Ray never — and this is disturbing here, because Ray never mentioned at the final argument anything about pregnancy. This was not even mentioned. So if it was developed during the cross-examination of Crouse, possibly there was a few possible questions there, it was a throwaway because he never argued it. And so, you know, and this is where the district court, I think, ran into error, because it said, it held that basically Ray capitalized on some testimony about pregnancy, but there was never any argument about the pregnancy. So this is ineffective. We have some other points here. The confession here, which counsel and I think the district court put a lot of stress on, we have to remember here that he made this confession at a time when he was being threatened with a death penalty, when threats were being made by the police and threats were being made to Barbie and his family by Ron Dodd. And he thought, he was under the impression that an accidental death, this is what the police told him, an accident is an accident, so it's no big deal. So he confessed under these assumptions, which were wrong, and he repudiated them. He repudiated them consistently within a very few days of him being arrested. And as far as an expert to testify on his behalf about this, but the expert couldn't do it. So, I mean, that seems like the lawyer isn't ineffective in that circumstance. He's trying to get around these two confessions. And one he can say, well, maybe the police were threatening him in some way, but you can't do that with the freely given to the ex-wife or to the wife. Yes, but, again, these were not the theory of the case. You see, the theory of the case was accidental strangling, and that was a dead end. That was a no-go from the start because the statute didn't cover it, knowingly and intentionally didn't cover it. He would have been guilty anyway. So all of this investigation that counsel is pointing to is extraneous to their theory of the case, which was. . . It has to be done because a confession is a big deal. Oh, absolutely. No, it had to be done. And so he had to do this. This was important investigation. Oh, absolutely. No, I totally agree, Your Honor, but what he didn't do was try to back up the accidental death theory with, say, an expert who would have said, well, if she was pregnant, that would have been much easier for her to be accidentally strangled, and he didn't do that. He didn't do anything, really, except to ask some questions to the coroners, to one coroner, not Jayden's coroner, but Lisa's coroner, about what was, you know, how long it could have taken. But this theory was absolutely destroyed by the prosecution when the coroner's actual testimony was five to seven minutes it would have taken. He grasped onto some 30 seconds or a minute, I forget, of how long it would have possibly taken to render her unconscious. And this, again, was a red herring because it's not how to render her unconscious which is at issue. It's how long it would have taken to kill her. And with the bruises on her neck, Krauss said that these would only, the scars, would only occur after a prolonged strangling period which couldn't have been done accidentally. So the theory of the case was misguided from the start. So we have no witnesses to show this strategy. What theory would have worked? I mean, what would have been a better theory? I mean, are you saying the Dodd theory that they couldn't prove up by anything would have been a better theory, or is this just one of those cases where there's no theory that would have been any good under these facts? Your Honor, we're saying two things. We're saying that, number one, Cronick says that even if there is no theory, you still have to put the prosecution to the test to prove it beyond a reasonable doubt, and that's in Cronick. Number two, we're saying that there were a lot of things here, and they're detailed on pages 11 to 13 of the opinion granting the COA. It indicates that Ron Dodd had a lot to do with this. Even Mr. Ray said that he thought that Mr. Dodd had a lot more to do with this than he ended up getting. So there was financial motives to frame Barbie. Ron Dodd has a history of violence, and Mr. Barbie does not. There were lots of things that could have been done to put on this theory of Ron Dodd did it. I've got a red light. Do you have anything important that you haven't been able to tell us? I think that's about it, Your Honor. Mr. Ellis, you were court-appointed, and the court appreciates your service to your client and also to our system of justice, which couldn't operate without attorneys like you being willing to come forward and do your duty as an officer of the court. I appreciate that. Thank you, sir. I appreciate the honor of the appointment. And thank you, Mr. Hemelcourt, for your argument today also.